IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KENDREA BULLITT, | § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:23-cv-00909-M |
| HEARST COMMUNICATIONS, INC., | § § § | |
| Defendant. | § § | |

**MEMORANDUM OPINION AND ORDER**

On September 20, 2024, the Court heard argument on the Motion for Summary Judgment (ECF No. 31) and Motion for Leave to File Redacted Reply Brief and to strike as hearsay a Complaint in another case and articles on the internet (ECF Nos. 45–46), filed by Defendant Hearst Communications, Inc. At the hearing, the Court **GRANTED** the Motion for Leave and to Strike. The Court also orally **GRANTED** the Motion for Summary Judgment and details its reasons below.

**I.   Factual and Procedural Background**

The Amended Complaint alleges that Plaintiff Kendrea Bullitt, an African American woman, began working for Defendant in March 2022, as a recruiter on the Talent Acquisitions Team. ECF No. 6 ¶¶ 8–9. Plaintiff pleads she was hired and trained to support recruiting for the Houston region, where she worked for three months. *Id*. ¶ 9.

Plaintiff asserts that her manager, Stefanie Lopez, began assigning her weekly goals that other recruiters were not expected to meet and that in July 2022, a few days after she told Lopez that she "had a tendency to micromanage her and others," Plaintiff was reassigned to recruiting in the Midwest region. *Id*. ¶¶ 10, 12–14. After she inquired about the reassignment, Plaintiff

1

alleges she was told by Lopez to "put her big girl panties on." *Id.* ¶ 15. Plaintiff claims that "the comment was inappropriate, and that the reassignment was unfair and baseless," and that she escalated the issue to Human Resources ("HR"), where she was told by Renee Peterson, Hearst Newspapers' Senior Vice President of HR, that her move to the Midwest region was a business decision. *Id.* ¶¶ 16–17. Plaintiff alleges she complained she was discriminated against as the only African American recruiter on the Talent Acquisitions Team. *Id.* ¶ 23.

Plaintiff alleges that on December 13, 2022, at a meeting with Lopez and Sean Kurysh, Hearst Newspapers' Director of HR, she "was offered either a performance improvement plan ("PIP") or a six weeks' pay severance offer." *Id.* ¶¶ 18–22. She was placed on the PIP. *Id.* ¶ 21.

Plaintiff pleads she successfully completed the PIP in January 2023, but that on February 17, 2023, she was "abruptly terminated," after asking HR to investigate complaints of race discrimination. *Id.* ¶¶ 28–31.

Plaintiff asserts claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, Chapter 21 of the Texas Labor Code, and 42 U.S.C. § 1981.

**II.   Legal Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The summary judgment movant bears the burden to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant may satisfy its burden by pointing to the absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the summary judgment movant has met its burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the non-movant. *Id.* However, the non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

### III.  Analysis

Defendant moves for summary judgment on all of Plaintiff's claims. As explained below, the Court concludes that summary judgment for Defendant is appropriate because Plaintiff does not identify an actionable claim of disparate treatment under Title VII and Chapter 21 of the Texas Labor Code. Plaintiff's failure to meet that standard means she cannot satisfy the higher *but for* causation standard required for her Section 1981 claims. With respect to her retaliation claims, Plaintiff raises no genuine issue of material fact.

#### A.  Race Discrimination

Defendant argues that Plaintiff cannot establish a *prima facie* case of race discrimination because she cannot show that she was treated less favorably than were similarly situated recruiters who are not African American. Alternatively, Defendant argues Plaintiff fails to raise a genuine issue of material fact as to whether Defendant's stated reason for her termination— that an economic-driven decline in open employment positions offered by Defendant led to a need to eliminate one recruiter position, and Plaintiff was the lowest performing, non-technical recruiter —is a pretext for discrimination.

3

Discrimination claims arising under Title VII and Chapter 21 of the Texas Labor Code are analyzed under the same evidentiary framework.[1] *See Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 n.10 (5th Cir. 2001).

For discrimination claims based on circumstantial evidence, as is the case here, a plaintiff must satisfy the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this framework, a plaintiff carries the initial burden of establishing a *prima facie* case by showing that she (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group. *Sanders*, 970 F.3d at 561. If a plaintiff meets this burden, the employer must articulate a legitimate, nondiscriminatory reason for its action. *Id.* at 562. If the employer articulates such a reason, the burden shifts back to the plaintiff to show, with "substantial evidence," that the stated reason is a pretext for discrimination. *Id.*

Summary judgment for Defendant is proper because, regardless of whether Plaintiff has established a *prima facie* case of discrimination, the Defendant offered a legitimate non-discriminatory reason for its action, and Plaintiff does not provide substantial evidence to show that Defendant's stated reason for her termination is pretextual.[2] Defendant states that it terminated Plaintiff's employment because an economic-driven decline in open employment positions offered by Defendant led to a need to eliminate one recruiter position, and Plaintiff was

---

[1] Section 1981 race discrimination claims require a plaintiff to establish that her race was the but for cause of the adverse employment action. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340 (2020).
[2] Plaintiff alleges that being placed on a PIP and not being allowed to work, though being paid, during her last two weeks of employment are adverse employment actions. The Court disagrees. She fails to demonstrate how either affected the terms, conditions, or privileges of her employment. *Compare Hamilton v. Dallas Cnty.*, 79 F.4th 494, 502–03 (5th Cir. 2023). Plaintiff does not plead that anyone but her supervisors knew she was on a PIP, and being paid while not being required to work cannot, in the Court's view, be an adverse employment action.

4

the lowest performing, non-technical recruiter. Peterson states in her declaration that in early 2023, there were eight recruiters on the Talent Acquisitions Team and 54 open positions to fill, a reduction from about 275 open positions that existed seven months earlier. (ECF No. 33–5, App. 204 ¶ 9). With a reduction in open positions of nearly 80%, Peterson explains, "it was not economically feasible to maintain eight recruiters on staff." *Id*. In deciding who would be terminated, Peterson testifies she evaluated recruiters based on several factors, including years of experience as a recruiter, tenure with Hearst, number of open positions converted into hires in 2022, potential future hires, and specialized skills. (ECF No. 33–5, App. 204–05 ¶ 11). Based on these criteria, Plaintiff was selected by Peterson for termination because, as a non-technical recruiter with six years of experience, she made only 31 hires in 2022, the lowest number of hires among the non-technical, experienced recruiters. *Id.*

In response, Plaintiff argues that Defendant's stated reason for terminating her is "inconsistent" and "flat-out wrong" because she was "not the lowest-performing recruiter." (ECF No. 37 at 29). However, Defendant provides objective performance criteria as the basis for its decision, meeting its burden of production by demonstrating that the rationale for termination of Plaintiff was legitimate and non-discriminatory.

In light of Defendant's legitimate, non-discriminatory reason for her termination, Plaintiff is required to prove that Defendant's stated reason for her termination is pretextual. Plaintiff's race discrimination claim is based on five specific events, but her evidence is insufficient to create a genuine issue of material fact that her termination was a pretext for discrimination.

   i. <u>Reassignment to the Midwest</u>

Plaintiff alleges that her reassignment to the Midwest region during a Position Reassignment in June 2022 was discriminatory because she was reassigned to the "most

challenging" region.  However, Plaintiff's evidence does not support the assertion that the Midwest was the most challenging region.[3]  Plaintiff relies on testimony from Brenda Velasquez, another recruiter on the Talent Acquisitions Team, but Velasquez never said the Midwest was the most challenging region, and Plaintiff offers no evidence of this.  Peterson states that the Midwest region was no more nor less challenging than other regions. (ECF No. 45, App. 546 ¶ 3).

Moreover, Plaintiff does not respond to Defendant's evidence that people from the Houston business unit expressed concerns about Plaintiff's inefficiency in filling open employment positions in that region.  (ECF No. 33–5, App. 203).  Defendant proves that these concerns were communicated to Lopez and Peterson on several occasions.  (ECF No. 33–5, App. 219–25).  These performance issues constitute a non-discriminatory reason for her reassignment, and Plaintiff offers no response to such evidence.

Plaintiff also does not respond to Defendant's evidence that Megan, a white woman, was also reassigned to another region when Plaintiff was.  Lopez moved Megan from Albany to Connecticut.  (ECF No. 33–3, App. 14, 102–03, 106–08).  Lopez's decision to reassign a white recruiter undermines Plaintiff's claim that her reassignment was the result of race discrimination.  Plaintiff's inability to identify a non-African American recruiter who was treated more favorably fatally undermines her claim of disparate treatment based on the reassignment.

      ii.    <u>Racially Neutral Comment</u>

Plaintiff argues that being told by Lopez to "put your big girl panties on" is evidence of race discrimination.  Plaintiff testified in her deposition that Lopez made the comment to her

---

[3] Plaintiff argues that Kyle, a white man, failed in the Midwest region and was terminated before Plaintiff was assigned there, as evidence to support her assertion that the Midwest was the "most challenging" region.  However, Defendant provided evidence that Kyle left Defendant voluntarily, and Plaintiff provides no contrary evidence. (ECF No. 45, App. 547 ¶ 6).

6

"with tone" in response to Plaintiff expressing her frustration about the reassignment. (ECF No. 33–6, App. 271–72 at 135–38). Defendant disputes the comment was made, but for purposes of summary judgment, the Court assumes it was. However, the statement is racially neutral on its face and does not support an inference of race discrimination. Further, it would be a non-actionable stray remark. *See McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457–58 (5th Cir. 2019).

   iii. <u>Performance Improvement Plan</u>

Plaintiff argues that her being the only recruiter placed on a PIP is evidence of disparate treatment based on her race. Plaintiff points to Velasquez's deposition testimony that she did not personally use LinkedIn Recruiter for sourcing candidates, as evidence that Plaintiff was treated less favorably by being placed on a PIP for not doing so. (ECF No. 34–11, App. 498 at 226:5–12).

However, Defendant provides a legitimate, nondiscriminatory reason for placing Plaintiff on a PIP—namely, to address her ongoing performance issues. (ECF No. 33–2, App. 16 ¶ 33). Plaintiff's primary role as a recruiter was to identify and fill open positions with qualified candidates, using both active and passive recruiting strategies. Shortly after joining Hearst, Lopez emphasized the importance of LinkedIn Recruiter as a tool for passive candidate sourcing. (ECF No. 33–2, App. 41). In October 2022, Lopez emailed the Talent Acquisitions Team stating that LinkedIn Recruiter "should be the main tool for sourcing/identifying candidates" to enhance the team's ability to find qualified candidates.[4] (ECF No. 33–2, App. 41). Although LinkedIn Recruiter was not the only method available for identifying candidates, the frequency with which

---

[4] Lopez also stated that individual LinkedIn Recruiter usage metrics would be shared with everyone weekly. (ECF No. 33–2, App. 41). Lopez informed the team it needed to strive to increase its LinkedIn Recruiter "message acceptance rate," the percentage of candidates responding to a message sent by the recruiter, from 24% to 30%. *Id*.

a recruiter used the tool became a key performance indicator for evaluating a recruiter's efficiency in candidate sourcing. (ECF No. 33–2, App. 8 ¶ 14). Despite Lopez's weekly emails encouraging the team members to increase their use of LinkedIn Recruiter, Plaintiff continued to struggle with performance issues, including failing to use LinkedIn Recruiter effectively to source candidates, and having difficulty filling open positions. (ECF No. 33–2, App. 7–10 ¶¶ 12–16, App. 16 ¶¶ 33–34).

In October 2022, Lopez and Peterson discussed Plaintiff's "very low to nonexistent" usage of LinkedIn Recruiter to source candidates and the potential for disciplinary actions if her performance did not improve. (ECF No. 34–4, App. 111–13). When Plaintiff continued to struggle with sourcing qualified candidates and filling open positions, she was placed on a PIP in December. The primary goal of the PIP was to improve Plaintiff's effectiveness in sourcing candidates by increasing her use of LinkedIn Recruiter. (ECF No. 33–3, App. 115–20). On the PIP, Plaintiff's weekly LinkedIn Recruiter sourcing goals were set at 10% below the team's weekly average. (ECF No. 33–3, App. 119). The evidence shows that Plaintiff's usage of LinkedIn Recruiter began improving while she was on the PIP, including the number of candidate searches she performed, candidate profile views, and emails accepted by candidates, and continued to improve after the PIP ended. (ECF No. 33–2, App. 32–36). Plaintiff's poor LinkedIn Recruiter use and improvement on the PIP, during which Lopez worked closely with her, supports Defendant's assertion that the PIP was focused on addressing Plaintiff's performance deficiencies.

Defendant disputes Plaintiff's position that Velasquez was similarly situated to Plaintiff, but was not placed on a PIP, because Velasquez filled 137 positions in 2022, compared to Plaintiff's filling 31 positions. (ECF No. 33–5, App. 232–33). Although Velasquez's usage of

8

LinkedIn Recruiter was low, unlike Plaintiff, Velasquez did not struggle with sourcing candidates and filling open positions. Plaintiff's inability to identify a non-African American recruiter who was treated more favorably or to provide substantial evidence rebutting Defendant's stated reasons for placing her on a PIP means she does not show Defendant's reasons were pretextual.

   iv. <u>Investigation</u>

  Plaintiff argues that the investigation into her December 7, 2022, discrimination and retaliation complaint was insufficient because only Lopez and Peterson were interviewed by Sean Kurysh, Defendant's Director of HR. Plaintiff contends that Kurysh's failure to interview Velasquez renders the investigation inadequate, creating an inference of discriminatory animus against Plaintiff. In her deposition, Plaintiff testified that she complained about Lopez treating her differently, specifically giving her different LinkedIn Recruiter usage goals that were not given to other recruiters, telling her to "put [her] big girl panties on," and reassigning her to the Midwest. (ECF No. 33–6, App. 283 at 183–84).

  Defendant's evidence shows that Kurysh investigated after Plaintiff's complaint was made. (ECF No. 33–16, App. 531–36). Kurysh interviewed Plaintiff and Lopez on December 7, 2022, and Peterson on December 8, 2022, and subsequently made the recommendation to "[c]lose out the investigation with no findings." *Id*. Although Plaintiff believes that Kurysh should have interviewed Velasquez, Kurysh testified he did not interview Velasquez because he did not believe she had information relating to Plaintiff's discrimination claims. (ECF No. 34–7, App. 391 at 79–81). Kurysh's belief in that respect is supported by the fact that Velasquez was not present when Lopez allegedly made the "big girl" comment, nor was she involved in the decision to reassign recruiters to different territories. (ECF No. 34–10, App. 472 at 122).

9

Velasquez also testified she knows of no basis for the Plaintiff's claim that she was the victim of race discrimination. (ECF No. 34–12, App. 515–16 at 297–98).

Moreover, Plaintiff does not provide sufficient evidence showing how interviewing Velasquez, or any other recruiter, would have significantly altered the investigation's findings. Plaintiff's belief that others should have been interviewed does not demonstrate that the investigation was inadequate or motivated by racial bias. Additionally, after Plaintiff met with Kurysh in February 2023 and requested that Velasquez be interviewed, Kurysh did so. (ECF No. 33–16, App. 531–36). After Velasquez's interview, Kurysh maintained his original finding.

    v. <u>Termination</u>

Plaintiff argues that she was not the lowest performer on the Talent Acquisitions Team, suggesting that Defendant's stated reason is a pretext for discrimination. Plaintiff points to evidence that her LinkedIn Recruiter usage metrics improved after the PIP and that a non-African American recruiter, Bhatia, filled only 27 positions compared to Plaintiff's 31, to argue that she was not the lowest performer and that her selection for termination was discriminatory. (ECF No. 33–5, App. 232–33). However, Defendant provides evidence that Bhatia handled technical recruiting, a specialized skill, and she had been a recruiter for only less than a year.[5] (ECF No. 45, App. 548 ¶ 8). When all relevant factors were considered by Peterson, she found Plaintiff to be a low performer and most appropriate for termination. (ECF No. 33–5, App. 204–05 ¶ 11).

---

[5] A technical recruiter fills unique and distinct technical recruiting roles that "generally are more challenging and take longer to fill than the editorial and other roles handled by the other recruiters." (ECF No. 45, App. 548–49 ¶¶ 8,10).

10

Although Peterson testified that Plaintiff's PIP factored into her decision to terminate Plaintiff, it was not the only factor. (ECF No. 34–6, App. 360 at 170–71). More significant was the fact that Plaintiff filled the fewest positions among experienced recruiters. (ECF No. 33–5, App. 205 ¶ 12). Plaintiff does not present evidence that Defendant's stated reasons for her termination were pretextual.

Because Plaintiff cannot meet the lower standard of causation under Title VII or Chapter 21 of the Texas Labor Code, she does not meet the higher but for causation standard required for Section 1981 claims. Plaintiff's "subjective belief" of discrimination does not equate to proof and cannot be the basis for relief. *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 470 (5th Cir. 2021).

### B. Retaliation

Defendant argues that Plaintiff fails to establish a *prima facie* case of retaliation, but even if she could, she does not raise a genuine issue of fact as to whether Defendant's stated reason for her termination is pretextual.

Like her discrimination claims, Plaintiff's federal and state retaliation claims are to be analyzed under the *McDonnell Douglas* burden shifting framework. *Sanders*, 970 F.3d at 561; *Gorman v. Verizon Wireless Tex.*, L.L.C., 753 F.3d 165, 169 (5th Cir. 2014). To establish a *prima facie* case of retaliation under Title VII and Chapter 21 of the Texas Labor Code, a plaintiff must show that: (1) she participated in a protected activity; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action. *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020). An employee engages in protected activity if the employee "opposed any practice" made unlawful by Title VII, or if she "has made a charge, testified, assisted, or

11

participated in any manner in an investigation, proceeding, or hearing" under Title VII. *See* 42 U.S.C.A. § 2000e-3(a).

If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to state its legitimate non-discriminatory reason, before shifting back to the plaintiff to demonstrate that the employer's reason is a pretext for retaliation, and the plaintiff must show that the adverse employment action would not have occurred but for the employer's retaliatory motive. *Brown,* 969 F.3d at 577.

Plaintiff alleges that she was fired in retaliation for her reports of discrimination in December 2022 and February 2023.[6] As an initial matter, Plaintiff's February 8, 2023, complaint of discrimination to Kurysh cannot support her *prima facie* case, as the evidence shows that the decision to terminate Plaintiff was made on February 6, 2023, when Peterson emailed her supervisor stating that Plaintiff's position was chosen for elimination. (ECF No. 33–5, App. 227). Plaintiff's meeting with Kurysh, occurring after the decision was made to terminate her, makes it impossible for Peterson's decision to be in response to that complaint.

Plaintiff's December complaint about unlawful discrimination was made after she was placed on the PIP. In her complaint, Plaintiff alleges discriminatory and retaliatory treatment by Lopez, evidenced by Lopez placing her on the PIP and reassigning her to the Midwest region a few days after Plaintiff provided solicited feedback to Lopez, describing her as a micromanager. (ECF No. 33–6, App. 268 at 128).

Defendant's evidence shows that Lopez's proposal to reassign Plaintiff to the Midwest region was made on June 22, 2022, nearly three weeks before Plaintiff gave solicited feedback to

---

[6] Plaintiff alleges that she engaged in protected activity by emailing Kurysh on February 3, 2023. (ECF No. 37 at 7). However, the evidence shows that her email requested only that she and Kurysh have a conversation about her PIP. (ECF No. 33–17, App. 538–39). The email did not reference any allegedly unlawful practice and, therefore, does not constitute protected activity. *Id*.

12

Lopez on her management style, demonstrating that the reassignment could not have been done in response to Plaintiff describing Lopez as a micromanager. (ECF No. 33–3, App. 102–04). Velasquez testified that Plaintiff's feedback was consistent with solicited feedback provided to Lopez by other recruiters on the Talent Acquisitions Team. (ECF No. 34–11, App. 507 at 265; ECF No. 34–12, App. 508 at 266). Because Plaintiff's complaint about discrimination in December 2022 was made after she was placed on the PIP, her placement on the PIP was not in response to her complaint and thus was not retaliatory. (ECF No. 33–16, App. 531).

Although Defendant argues that Plaintiff cannot establish a causal link between the December complaint of discrimination and her termination in February, the Court does not find that the two-month gap between Plaintiff's complaint and her termination could not, as a matter of law, establish a causal connection sufficient to establish a *prima facie* case. However, this is an academic issue, because the Plaintiff does not provide substantial evidence rebutting Defendant's non-discriminatory reason for her termination.

Plaintiff attempts to show pretext by pointing to two emails between Lopez and Peterson in December and February. In the December email, Lopez mentioned feeling like she was "walking on eggshells" around Plaintiff because Lopez could be accused by Plaintiff "of something quite serious" that could result in Lopez losing her job. (ECF No. 33–4, App. 184). In the February email, Lopez noted a lack of "decency, maturity, and professionalism" among several recruiters when sharing the weekly individual LinkedIn Recruiter usage metrics with the team, particularly in comparing their metrics to other recruiters. (ECF No. 34–2, App. 44). Lopez's email to Peterson, informing Peterson that she would stop sending individual usage metrics and only allow team members to view the team averages, did not reference Plaintiff or

13

any recruiter by name. *Id*. This email was not solely directed at Plaintiff and does not reflect retaliatory animus specifically directed toward Plaintiff. *Id*.

Plaintiff contends that these emails demonstrate Lopez's retaliatory animus towards her, and that Lopez influenced Peterson's decision to terminate Plaintiff. However, the evidence shows that before Plaintiff was terminated, Lopez provided Peterson only with an open employment positions report and the number of open employment positions for each recruiter, without making any recommendations on who should be terminated. (ECF No. 33–5, App. 227–28). Peterson made the termination decision. (*Id*., App. 207). Moreover, she is the same person who hired Plaintiff, creating a "same actor inference" that animus was not a factor in Peterson's termination decision. *Id*.; *See Gilbert v. Big Bros. Big Sisters of Am.*, Inc., 262 F. Supp. 3d 402, 409 (N.D. Tex. 2017) (same individual that promoted and hired employee creates a presumption that animus was not present in the termination).

Plaintiff did not present substantial evidence to rebut Defendant's non-discriminatory reason for her termination. Plaintiff's failure to demonstrate that her complaint was the but for cause of her termination eliminates a genuine issue of material fact, warranting summary judgment on her retaliation claims.

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**. The Court will enter a separate final judgment.

**SO ORDERED**.

October 24, 2024.

BARBARA M. G. LYNN
SENIOR UNITED STATES DISTRICT JUDGE